Judge Southwick will be participating in the arguments this morning via telephone. He's not able to be with us this morning in person. The first case on our docket this morning is 23-40582 Petteway v. Galveston County. Mr. Nixon. May it please the court. Section 2 of the Voting Rights Act does not protect coalitions. Consequently, this court should reverse the trial court and render judgment for the defendants. In her concurrence and clemency, Judge Jones told us why. There should be no need to discuss the minority coalition theory of vote delusion because the text of the Voting Rights Act does not support it. Not only does the text of the Voting Rights Act not support coalitions, adopting or requiring coalitions would abrogate Jingles, Bartlett. It would violate the anti-representation provision of Section 2 and result in race-based redistricting with no logical end point. In sharp contrast to a textualist reading, the plaintiffs abandoned the rules of statutory construction, ignored the words in subsection A, race and color. The United States urges this court to hold that class is only a generic reference and does not necessarily mean a group that shares the same identity. So here's where we are. A clear, unambiguous reading versus a tortured textualist or tortured interpretation where the protected class has no identity other than political. I welcome your questions. Well, Mr. Nixon, if you work correct in your understanding of the majority minority, you said render. Is render, there's nothing to send back to the district court in this case, anything, house cleaning, you know, important claims that might be under state law or anything else left in this case? There's nothing else left. The judge purposefully and told us in his judgment that he was not deciding intent for the constitutional claims and then entered a final judgment. This case was brought up. It was argued on a shortened schedule and there was no effort made by the plaintiffs to preserve those points of intent or constitutionality. In fact, the date of the argument was only 25 days from the date of entry of the judgment. Plaintiffs still had five more days if they wanted to, to file a cross appeal or their own notice of appeal. They still had three more days to file a motion with the trial court to amend or modify the days because the United States has 60 days in which to file a notice of appeal. None of those things were done. Even after the plaintiffs were informed during oral argument that they did not request or preserve or brief those points, anything else left, they still did nothing. I seem to recall that the district judge did not reach a few points and I could certainly be wrong, but I thought he did not find it necessary to reach a few issues. Yes, that's paragraph 429 of his findings of fact and conclusions of law. And he said I am not reaching these and I'm not ruling on them. And what issues were those? Those were an intent and a constitutional issue. So there's nothing left for the court to decide. But wouldn't he go back and reach those issues if we reversed? And I'm not foreshadowing by any means. I'm just wondering what the status of the case is. Well, you know, Rule 4 is very specific. You have to file a notice of appeal. If you look at the brief, there's been no request by the plaintiffs, none, to ask his court to send it back. There's been no request saying that the trial court erred in not ruling on those two points. Well, couldn't you have the position that, I guess we'll ask the other side, that the court didn't err, it just didn't need to address them, but it might need to address them if the court took a different position here. And I'm not, again, not foreshadowing. I've been a trial attorney for a long time and I've learned many, many years ago that move-along counsel is not preserving error. You have to stand your court to say please sustain or overrule my objection. In this case, and this is not new to this court, in the case of Moreau v. Harris County, a very similar thing happened and this court said that those claims were abandoned. There was no, so it was a very similar thing where they did not preserve error on the remaining. Do you want to address the matter that we're here about today? Yes, yes. So we just need to look at Section 2. What words in Section 2 support requiring coalitions to be drawn? There aren't any. It doesn't exist. How does your argument square with Section 1 of the Dictionary Act, which tells us to assume that words importing the singular include and apply to several persons, parties, or things unless the statutory context indicates otherwise? How does that argument, you just made square with that language? In this case, it's very clear that first you read the language of the statute. Under the rules of statutory construction, if you read the language of the statute, the statute makes sense. There's nothing in the Dictionary Act which would require this court or any court to look at class of citizens or a protected class, to mean protected classes. In fact, what it does, if you would agree, would you agree that discriminating in favor of a race, preferring a race, is the same thing as discriminating against other races? Yes. That's essentially the principle of the Harvard case. Yes. Why does that not foreclose your textual theory? Because the rights of the protected... Essentially the same idea here, right? If we presuppose the facts, which I realize this is about the law here, but if we presuppose that the white majority was favoring the white majority, isn't it therefore favoring non-whites? Well, that's what you would get to if you read class to mean a group that does not share the same identity. You would devolve into simply a white versus non-white. I guess I'm trying to channel what Judge Douglas was saying, is why isn't it discriminating on the basis of race to say both races are not, both are non-white, and therefore you're discriminating on the basis of race? Because protected class is defined in Section A. It is based on race or color. Hispanics came into the Voting Rights Act only on the basis of language minority, didn't they? Yes. So I don't really see... That's what the argument is. Well, yes. And unlike the Harvard case, this is not a case of intentional discrimination. We don't have any intent finding in this case. Could you speak to the Sixth Circuit's dissent concerns that your theory would allow discrimination as long as it affects two groups instead of one? And I'm particularly worried about whether you're going to be asking courts to engage in race science in one of two ways. Either courts will now have to delineate racial singularity, which I would think would be impossible for six million Americans who are Afro-Latino, or courts would have to exclude mixed groups, say Asian Americans, on the theory that Filipino Americans have different interests than Chinese Americans. So I'm asking you to address the dissent in the Sixth Circuit that says you're creating a rule that will ask the impossible racially, both for people who have mixed minorities or for mixed groups that have different interests. This is where the bright line that was established in Jingles helps us answer this question. If you have a bright line of a majority of a minority, a legislator knows what to do. Someone who's drawn can follow that infidelity to the court's opinions in the Constitution, can draft laws. Okay, I'm not asking about the legislature. I'm asking you, what happens to an Afro-Latino? Does that person have to choose which minority interests they affiliate with to get protection under Section 2? That's my specific question. So the census data is what's used. Does that Afro-Latino American have to choose which minority interests? That's my question. Please, could the lawyer answer it? You asked, let him answer it. They are self-answered in the census. That's where they make their choice. And they are allowed to choose whichever group that they choose to be a member of. So the census today has Middle Eastern and North African. And your theory that to get Section 2 protection, those people with mixed affiliation will have to say in the litigation, oh, I identify more with the Filipino side of my Asian American-ness than I do the Chinese American side. I think you are actually helping clarify why we need a bright line. A legislator is incapable of making those decisions. And the Supreme Court in Bartlett forewarned us of this problem. So courts are capable of making refined and exacting factual inquiries. They are inherently ill-equipped to make decisions based on highly political judgments of the sort that crossover district courts require. You could take the word crossover and substitute coalition as the analysis is exactly the same. I honestly have never understood the equivalency you're suggesting from Bartlett. Because here we've got one protected minority group that we're saying Section 2 will allow to be added to another. Bartlett, you have a protected minority group, and the Supreme Court said you're not going to be able to add an unprotected majority group. Those two are very different cases. Well, except that the crossover district is only a subset of the Anglo district, of the Anglo coalition. And Bartlett specifically said that they were not dealing with coalition claims. Is that incorrect? Yes, they weren't dealing with coalition claims. But I am here to suggest to you that if you substitute coalition for crossover analysis in Bartlett— Then who are we to do that if the Supreme Court declined to do so? If the Supreme Court hasn't reached that decision, this may be the case in which that happens. But today, the analysis in Bartlett and the reasoning in Bartlett is absolutely applicable to this case. Your point is all the logic applies, right? Right. Bartlett says you can't put two races together. That's politics. Your point is it's the exact same thing here. Everybody— So from a workability standpoint, Bartlett addressed a workability standpoint. We find support for the majority-minority requirement in the need for workable standards in sound judicial and legislative administration. The rule draws clear lines for courts and legislators alike, which is getting back to what I was talking about. You're a legislator. You have census data. How are you to draw lines if you are required to coalesce different groups and, as the United States suggests, groups that don't share the same identity? How is a legislator supposed to comply with the law if that's the rule? Well, doesn't that give them a Hobson's choice? If you've got a city like Houston, which has a large population of Asians, Blacks, and Hispanics, or Fort Penn County, and the legislature decides to make coalition districts as opposed to single-member racial districts or language-minority districts, who's going to sue? NAACP will sue and say, we need a Hispanic district, but they can defend and say, well, coalition districts are okay, can't they? That's the problem. Every redistricting . . . There's no rule here. There's no rule. It really won't be done by legislators. It'll be done by litigants in courts. One of the lawyers with whom I was prepping this case suggested, not really not coalition is the right word, stacking. You just keep stacking minorities until you get a district and then you keep stacking other minorities until you get a district, which is what the requirement would be. The distinction between what are we talking about in terms of how to coalesce? What's the rule? The only thing that we can see is that there is a desire on behalf of different groups for a political coalition. That's where we are. That's the case. Mr. Nixon, over here. I'd like to follow up on Judge Higginson's question. Judge Higginson was talking about some fears of the dissent in the Nixon case in the Sixth Circuit, that a rule that forbade the stacking of minority groups with respect to a vote dilution claim would disadvantage, say, Asian Americans, because you might have different strains, different nationalities, different ethnicities of Asian Americans, and so they wouldn't be able to bind together and it would disadvantage them. That decision was in 1996, I believe. Have any of those fears come to pass in the last 28 years? You know, I don't know how the redistricting has been done. I'll say yes, it's the fears here in Galveston County. No, no, the fears of the dissent that would hamstring minority groups that would be unable to bring vote dilution claims because you're engaging in some sort of quote-unquote racial purity, which I think is the language the dissent used in that case. Has that come to pass in the last 28 years? No, no. So there's two things that are going on. There's a difference between a vote denial case and a vote dilution case. So this is a vote dilution case, not a vote denial, and so how do you . . . what are the elements of a vote dilution case? What must the plaintiffs prove? The United States Supreme Court, clear, Jingles, the first Jingles precondition says you've got to prove that a majority is compact enough, a majority of a . . . there is numerous enough of a minority to have a majority-minority district. Jingles won. That's the first requirement. We don't have that here. Admittedly, everybody agrees. Trial court agrees. Plaintiffs agree. Everybody agrees. We have the African-American, the black community, which only comprises of the best you can do is get 30 percent in a district, and then together with the Hispanic community, it's 25 percent. Neither one . . . neither one make Jingles past Jingles, the first Jingles precondition. None of them. And so that's where we don't have a cause of action. That's . . . and the first Jingles precondition must be a bright line element of a vote dilution cause of action. Otherwise . . . otherwise you turn legislators into psychics, in courts into political accountants. You take away from the function of what we're doing. And it was really clear we . . . so Bartlett said again very clearly, we find support for the minority-majority-minority requirement in need for a workable standard, right? So that's where we are. We have to decide what is the cause of action for a vote dilution claim? What are the elements? The first element must be you have to have a majority of a minority in a district. So you're aware . . . you're aware that Judge Strass . . . sorry . . . Judge Strass on the Eighth Circuit said that there is no private cause of action at all. Right. You have not argued that? No. No, we've just . . . we've just stuck to the one . . . the one point we have, which is that coalitions are not protected. Mr. Nixon, could you address the statutory stare decisis argument made by your friend on the other side? Sure. There are five reasons why this court should not follow its decisions in campus in Clements. The first is that those decisions were wrong. They just assumed that because of our prejudice that these two groups belong together. But the second is, if you read the statute, it's not there. There's no coalition claim in the statute. Remember that the rights persist from the statute. They are derived from the statute. They don't inherently exist anyplace else. I think my question was a little something different, and I'm sorry I didn't make it more clearly. It was not about our stare decisis or something in the campus. It was about Congress has had the . . . has amended a number of times and not changed. That's the argument that I saw advance that I was hoping you might address. Congress did not include coalitional claims. No, the theory . . . no, I think more precisely the question is, as in Allen v. Milligan, the Supreme Court said, we're not going to do away with jingles because, after all, that decision was in 1987, and Congress had abundant opportunity to change the law if it wanted. The argument seems to be made here that because there have been . . . there has been this theory accepted only in the Fifth Circuit that there is a pot . . . that legally there is a coalition claim that Congress could have addressed that and changed the law if they didn't like it. Well, it's interesting. There are two bills pending before Congress now. One's in the Senate. I think it's Senate Bill 1, and there's another one in the House, but I think it's House Resolution 6. Both of those have amendments to the Voting Rights Act. Both sponsored by Democrats include coalitions as a . . . as putting coalitions into the Voting Rights Act. Strong inference. You have over 200 authors on the Democrat side of the aisle who want to put coalitions in that they don't believe coalitions are in the statute. But it just is . . . it's . . . Judge Higginbotham looked at this issue and wrote a wonderful dissent that was essentially added to by Judge Jones and then adopted essentially by the Fourth Court of Appeals, and they wrote very clearly, we can't give you rights where they don't otherwise exist. Congress didn't do it. They didn't do it. They're not here. So the concept of, or the argument is, Congress didn't undo Campus and Clements isn't . . . it's where they haven't really been . . . those decisions have not been followed by the other circuits. And the Supreme Court's reserved it. It's a little weird to say there's statutory stare decisis for something that's literally open. The Court answered the questions before. Oh, sure. And so it wasn't before. They had . . . Look, every time the Supreme Court has dealt with an influence district, they've said nothing, whether it's been an influence or whether it's been a crossover. Your point is this is essentially a crossover district of a kind. This is a kind of a crossover. The only difference is that this is a minority crossing over. But there's no words, and here we have to just get back. There are no words in the coalition for people who want . . . put me together with this other group. I can't win an election by myself, and they can't win an election by themselves. So put us together, and we'll win an election. What's your best evidence that that fear has come to realize since the addition of these claims to the jurisprudence? I'm sorry? What is your best evidence that that fear has come to realize since the addition of these claims to the jurisprudence? This case, the County lost this case because coalitions were required. Because in your argument is that political coalitions were created? It is a political coalition because this is not a case of . . . now, everybody admits we don't have a majority of a minority in the district. So one group has to invite another group to join so that they can win an election. And they admit that. In fact, the United States makes a very telling statement in its brief. In this case, they write, coalition plaintiffs have in common that they enjoy less political opportunity than other voters on account of race, color, or language minority status as a result of the districting plan, meaning that we can't win. So we have to have another group. And what do we enjoy together? Political opportunity. On the account of race and the other things that are stated there. I'm sorry? On account of race and the other things stated there. You can't read that out of the statement that you just read, correct? So what is the coalition? The fact that we have to talk about joining two disparate groups that have inherent characteristics and qualities and say that they are really won. Well, they're not really won. The statute doesn't say that we have to join them. This is a mandate on jurisdiction. So then my last question, if the Chief will allow, because I see that you're running out of time, is that what the Supreme Court has said is that the Voting Rights Act should be interpreted in a manner that provides the broadest scope possible in combating racial discrimination. So how does that square with your argument? They did it. Jingles. They did it. They brought, they interpreted it broadly. They gave us a clear standard in Jingles. Jingles has withstood tests to expand it. It's also in Allen versus Milligan, withstood tests to shrink it. So Jingles is how Section 2 is broadly interpreted. The one thing the courts are not to do is replace their own words with the words of Congress. Congress did not put a coalition claim into subsection B in the results test. This court did not do that, which Congress chose as a matter of public policy not to do. Thank you, Mr. Excellency. It's like you've said some time for a while. May it please the Court, Joaquin Gonzalez on behalf of the NAACP LULAC Appellees. One key issue in three sentences, subsection B defines a clause based on protection under subsection A, which restates the language of the 15th Amendment. To quote this court, under the 15th Amendment, voters are treated not as members of a distinct race, but as members of the whole citizenry. Appellants asked this court to overturn 40 years of settled circuit law in order to impose a single distinct race requirement, instead of treating discrimination as a fact question, as it is in every other analogous legal context, and as it was in the pre-Bolden case law that Congress codified. If I might pick up on a point that I believe Judge Ho was making, what it means to be discriminated on on account of race. If you'll indulge me in an analogy, consider two highway signs. One sign says no blue cars, and the other sign says only green cars. A blue car in that is being discriminated on the basis of color, because it is a blue car. And if you look at how the Bostock Court defined on account of, but for causation, if you take away its blue identity, then it could drive on that highway. But on the second instance, with only green cars allowed, if you take away its blue identity, it still can't drive on the highway, because it's not green. And in that case, it's, but it's still a discrimination on account of race. And in this case, Black and Latino voters are both being, suffering discrimination on account of race in this jurisdiction. And I would point you to the pre-Bolden case law and Congress's treatment of that in the legislative history and the Senate report. In fact, the first instance of the word class and the first instance of the phrase class of citizens was a quote from an early iteration of Jones v. City of Lubbock, in which the class at issue was a class of Black and Latino citizens. And in every other context, in school segregation and the keys. Well, actually, the Jones v. City of Lubbock stands sort of isolated, doesn't it? Because Wright v. Rockefeller, cited in the Senate report, was pre-Voting Rights Act, was it not? Wright v. Rockefeller was cited for the proposition that at that point in time, only intentional discrimination was the law. White v. Register, as he cited in the Supreme Court, had to do, that was brought by one of our colleagues, by the way, on behalf of the Texas Republican Party. And he was arguing that the treatment of Hispanics in San Antonio was different from the treatment of Blacks. In other words, they were not coalitions. They were entirely separate, were they not? In White v. Register, but I'd also point to after White v. Register was sent back down, the court addressed an actual, what we would now call a coalition claim, though they didn't think of it as a conceptually distinct category, in Graves v. Barn, which was affirmed by the Supreme Court sub nom briscoe v. Escalante. It wasn't affirmed. It denied its stay when the districts were redone. 435 U.S. 901 was the affirmation, and then a rehearing was denied, respectfully, Your Honor. I think it was his say, but anyway. But the point is that you cannot point to language in Section 2 that says that coalitions, which at that point in time, well, would have only been Black and Hispanic language, were covered by the Act. Well, Your Honor, our position is that class had a settled and well-understood legal meaning that suffering a common form of discrimination. Well, but that's not, but Section 2A defines the deprivation of the right to vote by a citizen on account of race or color or language, right? Yes, Your Honor. And 2B speaks of a class of citizens sharing that definition. So class refers to a citizen of a race or color. Well, Your Honor, I'd point to other legal contexts that also use similar on account of race language, Title VII in courts, including the Supreme Court in wards packing. Well, you never heard of a Title VII case, did you, where a Black person was fired and said, it was obviously discrimination because my boss used racial epithets, not against Blacks, but against Hispanics? There have been cases where Blacks and Latinos and other groups, indeed, there's been a case. Well, it may be that it was evident, but your theory depends on showing that the white majority are equally discriminatory against both. And I'm just saying, I am not aware of Title VII allowing group claims without proof of equal discrimination against both coalition claims, in other words. Um, but it's treated as a fact question. And in this case— I'm not aware of any such case in Title VII. I would point you to wards co-packing via Antonio, which specifically dealt with a class of Filipino and Alaska— Filipino and what? Alaska Natives workers. And there's also been cases where— I understand that, but what I posited, what I'm talking about is the language here, and the language, getting back to that, is a citizen denied or abridged because of race or language. And then in the following paragraph, a class of citizens, and the class is defined as a citizen deprived of race. I think that was my point earlier, Your Honor, that they are both suffering a similar deprivation on account of race, on account of not being a particular race. There's also been Title VII cases— If that were true, then wouldn't the Supreme Court in Gros and Bartlett have said the law specifically allows coalitions? Instead, in both of those cases, it said we are not deciding that question. Uh, well— It would be easy-peasy under the law if the statute says what you say. In Gros, Your Honor, the court said that it assumed without deciding that that would be all right, and that Bartlett didn't. I understand. You got my point. Uh, well, I think there's other— in the FHA context, school segregation, racial gerrymandering, that's how courts always treat these issues. It's a fact question whether a class is suffering a common discrimination, and class has a well-settled legal meaning in the sense of the federal rules of civil procedure. Are you going to address the question that came up before, which is, if we do end up reversing, is it a remand or a render? Your Honor, it would be a remand when a court properly applies constitutional avoidance principle or other statutory avoidance principles in order to not reach all the claims, as was said that courts should do by this court in B.C.B. Abbott. The only proper course is to remand for the district court to make fact findings in the first instance and conclusions, and specifically, the court said that it did not make fact findings related to that claim. But your opponent argues— and again, I'm not saying we will reverse. I'm just, you know, this is a hypo. But your opponent said, because y'all didn't bring this up on appeal or cross appeal or whatever, that that's wrong. I'm not necessarily agreeing with your opponent, but I want to give you a chance to say something on that. No, your Honor, it's correct for a lower court to not reach every single claim if the same relief is granted by one of the claims. We have a footnote in our brief footnote 9 that has a tenant, a Supreme Court case. I'd also point you to this court's opinion in Montano v. Texas. That's 867 F. 3rd 540, and this is common practice, and it'd be error for this court to itself in the place of the first fact finder, and if it were to adopt that rule, there would be a flood of appeals, unnecessary appeals in every litigation. I see my time's running out. Good morning. Nicholas Riley for the United States. There have been a lot of questions here about the text of the statute, and so I thought I would start there, because I do think this case ultimately turns on the text of the statute. In particular, on this phrase that we've been talking about, class of citizens protected by subsection A. Obviously, there's two understandings that the parties have furnished of what that word class is doing in that sentence, under the county's view, the thing that ties together members of that class is that they all belong to the same racial group. Under our view, plaintiff's view, the thing that ties together members of that class is that their right to vote has been abridged on account of race, so it's fundamentally a difference between whether the thing that ties together the class is a race-based identity or whether it's a race-based injury. Now, the reason we think— Are there any voting rights cases pre-1975 that dealt with Hispanics? Voting rights cases that dealt with Hispanics prior to— Under the Voting Rights Act. I'm not aware— Not the 14th Amendment, which is why deregister— I'm not aware of any, although I don't think that the— Well, isn't that the point? That's why Congress had to specifically incorporate Hispanics as a language group in 1975. I think the reason why Congress added the language minority provisions in 75 was to address the particular problem of language access, not just for Hispanics but for the other groups it identified. There were no cases prior to 75 of white voters bringing claims under the Voting Rights Act, but we know that they are protected, as this Court recognized in United States v. Brown, because the Voting Rights Act, plain text, protects discrimination on account of race. And I think that phrase, on account of race, color, or cross-reference language minority provisions, is ultimately why— But in 1975, would whites have been protected? I think so, under the text of the statute. It protects— But goodness gracious, I mean, you do agree, don't you, that the whole point of the Voting Rights Act of 1965 was to effectuate the 15th Amendment, which everybody knew was about black citizens? That's right. That was absolutely what motivated Congress. I don't think— And so Congress felt, when it decided to say that Hispanics had been discriminated in 1975, pulled them in as specifically, because apparently Congress may have thought they wouldn't have been in otherwise. I'm not sure that that's the right inference to draw, but even— But you have to rely on the Senate report, which talked about the shared concept of disability of language minorities, right? We do rely on that. We think that's telling as to what Congress thought. But I should say, we're relying on the text, and that's why I'm saying that I think fundamentally the reason why the injury-based understanding of class is superior to the identity-based understanding of class is because subsection A, which supplies the context, describes an injury. It doesn't describe specific groups. And again, United States v. Brown, protections for white voters, we know that every group is protected under subsection A. I think it's telling that all of the writings that have sought to argue that the coalition claims are not cognizable, the Nixon majority, concurrence in Clemens, all take as granted that the Voting Rights Act only protects specific groups. You can see that language in both of those opinions, and you can see that reflected in the county's approach here. In fact, subsection A protects a very particular kind of injury, just like the 15th Amendment, which it was you take that as the context, which I think is the correct context, you have an understanding that is injury-based. And I think that's reinforced by what we cite, which is just the plain, ordinary understanding of the word class. When you look at dictionary definitions, there is no single race component. Rule 23, when you look at other uses by Congress in, for instance, the 1964 Civil Rights Act, we cite a provision. In all of those instances, class was not understood to have a restriction to a single race. No, but we're not talking about a single race. We're talking about extending jingles. Extending jingles. In particular, prong one, but this also may affect prong three in many cases. And if it were as clear-cut as you say, why would the Supreme Court have said, assuming arguendo in grow, and said, we are not reaching this in Bartlett? Well, I think, just to the last point, it's very routine, I think, for the Supreme Court not to decide questions that haven't been briefed and that aren't directed for them. But in grow, there's no excuse. If it was obvious, the Supremes would have said, oh, I mean, this is what it is. Right. I don't want to get confused here and say that because our textual reading is the correct textual reading, that it's so obvious that the Supreme Court would have necessarily decided in grow. In grow, the Supreme Court had a very, very easy way of resolving the claim before it. So it's not obvious, which means that the law is ambiguous? No, I don't think the law is ambiguous. I think there is a correct textual answer. I think, but I think there's a correct answer. And I wouldn't infer or overread the fact that grow chose to resolve that claim on a very easy ground, which was that there was no evidence of political cohesion in that case. None. The plaintiff didn't even bother trying to put forward a showing. So just as a straightforward application of jingles that allowed the court to decide the grow claim in a single paragraph. That was three minority groups, wasn't it? Black, Hispanic, and Asian, right? In grow, yes. And again, there was no political cohesion, which I think reinforces that jingles is up to the task. Sorry, go ahead. I mean, there appear to be, has the world not changed from a racial standpoint in the last 40 years? I'm glad to say that the world has changed quite a bit. And that's one of the reasons why we see diminishing numbers of section two claims, as the Supreme Court pointed out in Milligan. That is not a reason to foreclose. Without coalitions, there will be more claims, will there not? There's no evidence of that based on the 40 years that this court has allowed coalition claims. This is the, I think, the second to reach successful coalition claim to reach this court in about 35 years. Well, the fact that they're not successful doesn't mean that people can't file suit. And that the ability of coalitions won't throw legislatures into complete tizzy, as Mr. Nixon explained. The fact that suits aren't successful as a general matter under the Voting Rights Act, as Milligan noted, is not a reason to misread the text or to ignore the plain meaning of the text. And so our position is that whether these claims are rare is a separate question. And they clearly are quite rare, is a separate question from what does the text mean? And again, we think this case turns fundamentally on the text. Could you go, in addition to the textual answer, is the Gingell's second prong vital to respond to the Galveston's argument that different minorities have different interests and that's political, that's not racial polarized? Is that doing a lot of work in these cases? Absolutely. And we've seen it do work. I think it's a great point because we've seen it do work in this court's coalition cases. We saw it in Brewer. We saw it in Rollins. We saw it in Clements. I would note it's not just the second Gingell's precondition that's doing important work here. It's also the third precondition because in a world where, and I'll just take, you know, some of the separate writings that this court has had on the coalition issue. In a world where we have two minority groups and we think they're functionally a political alliance and that they're not bound together by racial factors, say it's socioeconomic characteristics, as Judge Higginbotham has mentioned in some of his separate writings. If that were the case, then you would see white voters who share those socioeconomic characteristics crossing over and voting the same way. And the third Gingell's preconditions ensures that you're never going to have a claim succeed unless there's majority white voters. Before your time's up, could you address Bartlett? Sure, absolutely. So I think Bartlett was a case that was very different. It was different in a fundamental way, which is that when you're talking about crossover claims, you have both, as the Supreme Court noted, a conceptual doctrinal problem and a practical problem. The conceptual doctrinal problem is that if you're going to say that the minority group is reliant on white voters in order to elect their candidates of choice, that imposes obvious tension with Bartlett's third precondition, which is that you have to show majority block voting that submerges the interest of minority voters. How can you say that minority voters are being submerged by a white majority if they are dependent on white voters in order to elect their candidate of choice? There was also a practical problem, which was that you lose, as my colleague noted, the 50% bright line rule at the Gingell's first precondition. Mr. Eilert, I'm sorry your time is so low, and I wanted to ask Mr. Gonzalez this question, but how do we know that LULAC represents the view of Hispanic voters given the recent polling throughout the state of Texas about Hispanic voters? Sure, and if I can just take a moment to answer, I see my time. Yeah, how do we know? Yeah, so I think the reason why- LULAC is not an organization that polls all the Hispanic voters in Texas. It's just a group that receives funding and so files lawsuits. Right, so I think this goes to Judge Higginson's point, which is that when you have the second Gingell's precondition, the requirement to show political cohesion, you're in a world where you necessarily need- But the court didn't find political cohesion separately among Hispanics in this case, did it? It did, actually. He found political cohesion both within each group and between each group, and that is what we think the practice would be in all of these coalition cases. Based on what, a sample of local elections? Based on, I think it was dozens of general elections, based on primary election data, which he gave less weight but still credited, and based on nonpartisan local elections. All of the election data sets that he looked at in this case pointed in the same direction, which was towards significant levels of cohesion. What would you say if one of our cases had said that wasn't necessary? If one of your cases, just so I understand, had said that- Judge Gregory dissented in the 14th Court Circuit case, and he pointed out in our case law between Acampos and another case, and he said, I believe it was the Acampos Court. I have a lot of cases here. No, I think that's correct. I think I understand. Acampos Court had said that in order to make this claim succeed, you first have to show that Hispanics or whatever, in that case it was three groups, are cohesive within the group, and then you have to show they're cohesive among the three groups. But another case said in our court, no, that's too difficult. You don't have to do that, right? I think that's right. I mean, I- Which case is correct? Right. I understand the case that says that you have to show cohesion both within each group and between the two groups. Is that the law? That's not even the law in the Fifth Circuit, because we have conflicting positions. Right. I do think that is the law. That's how I read Clements' discussion of political cohesion. Clements is, of course, the en banc decision. I take that to be the approach, and to the extent that you think that the circuit law is unclear on this, I think this Court could clarify that cohesion in a minority coalition case has to be shown both within each group and between the two groups. I see my time is up. Thank you. May it please the Court. My name is Chad Dunn, and I represent the Petaway plaintiffs in this litigation. The trial court record is extensive in this case. For any of you that might be considering not granting relief, I implore you to read it, understand it as the district court did. It went on in painstaking detail on the trial court opinion in this case, categorizing the individual harms that the plaintiffs in this case have suffered and others like them. They weren't stacked, as Mr. Nixon would have it say. The circumstances in life in Galveston County stacked. There's a story I learned when I was young. My grandmother had a book under her coffee table about the 1900 storm, and back in the woods there wasn't much to do, so I would thumb through that book. Jack Johnson, the future heavyweight champion of the world, would wake up after surviving the 1900 storm in Galveston and see the early gray light of dawn and realize the destruction, and then have to swim to borrow a boat to save his family and the rest of the black and Latino families in the neighborhood then called the Tortilla Flats over by East Beach. Well, what official resources there were went and saved the white citizens. Now, that's ancient history, we might say, except that there's a boiling debate right now in Galveston County about rebuilding the public housing there after the destruction of Hurricane Ike. These are facts in this record. Hurricane Ike was 2008. Yes, I beg your pardon. Did I say? I thought I said the century. I beg your pardon, Your Honor. Sorry. I'm very sorry. But on talking about the stacking matter, the record in this case, as the district court found it, is that depending on which expert you listen to, white citizens, 85 percent of them vote for candidates, particular candidates. Black and Latino citizens also vote for 85 percent of different candidates. That's at page 53 and page 45 of the record. Not mentioned in this courtroom until Judge Elrod asked the question, was Starry decisive? The Supreme Court, when it recently chose to override the Roe v. Wade and the Casey decisions, grappled with Starry decisive and laid down five factors. Agreed, just wrong. The jurisprudence of the court has to have been causing harm. None of these factors are addressed by the county in their briefing. None of it has been addressed in the argument today. This court decided in Lulac v. Clements that coalition claims would be allowed under the Voting Rights Act. And it is the consistent application of the law and a variety of applications that gives birth to the rule of law, which itself turns and creates confidence in government. It is what holds our nation together, the rule of law. The county may have given you arguments that some of you may have agreed with at the time. Some of you may have become convinced of since then that perhaps the rule in Campos, perhaps the rule in Midland, perhaps the rule in Lulac v. Clements was decided wrongly. But what they haven't given you is why Galveston? Why this case and why now? Is it too much to ask for one seat at the table? That's what these citizens pull, hold, and trade for in the 1980s. They didn't go ask a court for it. It wasn't awarded in an earlier case. They made it happen on their own. And it's been performing since then until a new crowd was elected in 2010 that decided to decimate it. We would talk about Bartlett in here. The Supreme Court said on this coalition claim it's not deciding it for Bartlett, but it did say another thing. If it saw a case where there was a knowing destruction of a performing minority district, it would raise grave concerns. Well, here is that case. You may get another case from Victoria. You may get it from Tyler. You may get it from one of the other states that raise these hard questions about coalition districts. That may come. It hasn't yet in 40 years, but it might. But Galveston, Texas is not it. This place is different. When we celebrate today in June, emancipation coming to Galveston, Texas, a year and a half and centuries late, this court sends a message on the outside of the building. It says, John Minor Wisdom. In the Midland case, Judge Wisdom said, the prejudice of the majority is not narrowly focused. Indeed, justice in this case is allowing these people to retain the one voice they have, the dignity of being able to be heard in the hall of government. The majority will still control the policy issues of the day. It will win on many issues four to one, but when the rain is coming sideways into the side of the house, when the wind howls, when you're up in the middle of the night wondering if you're going to make it through this hurricane, these people are going to have a hard time If people know they have somebody to call who lives down the neighborhood from them, who knows them, who's lived their experience, that's what the Voting Rights Act was for. The Voting Rights Act absolutely applies in this circumstance. The court need not even address these difficult questions about coalition districts. For the reasons I've stated, the district court opinion should be affirmed and full in the extent that it is not. If it is reversed, it should be remanded for consideration of constitutional claims. I thought, yeah, doesn't he have five more minutes? Five more minutes. You had five minutes uninterrupted and then five minutes otherwise. I'm not, I'm not the chief, so I'm just, I'm just curious. Thank you, Your Honor, but the clock started at 10 and that was. No, it started at five. Okay, I'm always happy to talk. You know, to address some of the other questions that have come up here today, you know, the Voting Rights Act evolved initially as a protection for race and color, of course, in the 1965 enactment of it. It is true that it was amended in 1972 to cover language minority status and it was, and that language minority status was extended, of course, for writings that were provided by the county. The county has to provide election material in various languages. In Harris County, for example, that's up to a number of languages, Vietnamese, Chinese, Spanish, of course, and others. But the protection of the Voting Rights Act under race and color has been there from the beginning and the protection of citizens who have the ability to elect has been there from the beginning. And the point that I think is worth making that I think gets lost in some of the papers here in this case is that the, this is the intentional destruction of an existing district that performed on its own. These other cases that you hear about are plaintiffs who've come in and sued and said the government needs to draw a new district in this area. It needs to collect these coalitions of citizens together. The Supreme Court has treated those kinds of cases differently. And in Bartlett, as I mentioned, it explicitly said that you cannot intentionally or knowingly destroy a performing minority district unless you have a compelling governmental basis. And another important part of the record in this case is that the trial court dispatched in page after page each of the governmental bases that the county alleged for this. It's not partisanship. Republicans win every policy issue they want four to one. And each of the officers testified that they didn't do this because of partisanship. It wasn't personal. Everybody who testified said Commissioner Holmes was a gentleman, that he was an excellent representative of his community, and that he was available to his constituents. Mr. Dunn, could you address the idea that federalism would encourage or require a clear statement by Congress that is an argument on the other side by your friends? Could you address that? Sure. And I will address it head on. But what I would say first is this case doesn't present that question. But to address the question head on, the Supreme Court recently dispatched that argument in the Bostock case, the Title VII case, where, in fact, Justice Gorsuch, who wrote the opinion, used the famous Scalia quote about hiding elephants in mouse holes and said that Congress intended these Civil Rights Acts to be broad, to cover a broad amount of conduct that even the founders or the drafters of the legislation in Congress never foresaw. But their language is what we follow. And the language here in Section 2 gets sliced up. I mean, the reason the county wants to talk about jingles is because they realize the language itself is broad. And the language says any person. And it says people who are denied an equal opportunity to elect or nominate candidates of choice. Mr. Dunn, since you bring up the language, Section 2B requires a showing that the political processes, quote, are not equally open to participation by members of a class of citizens protected by Subsection A. Does your argument depend on the Dictionary Act allowing us to transform a class into classes? It's helped by the Dictionary Act. So is that yes, you want the Dictionary Act, you want this Court to say that the Dictionary Act allows us to amend members of a class of citizens protected by Subsection A to members of classes of citizens protected by Subsection A? No. The class covers the people who are harmed by the conduct. And the class can include people of any minority race. So we don't agree that the word needs to be classes. But then how does that, how does, I'm just thinking about this, how does the argument that we focus on injury and not identity, the government's position, not fly in the In other words, if you had a group of white voters and black voters who both suffered harm because of their race, the Supreme Court said, no, that doesn't count. How do we square that? I guess I'm unfamiliar with the precise case, Your Honor, speaking of. I'm talking about Bartlett. Oh, well, in Bartlett, it says the reason they can't bring a claim is because the only way they can elect a candidate of choice is by bringing in white voters. But my point is, is if white voters and black voters together are injured, and we look at injury because of race, that seems not to be squarable with what the Supreme Court said in Bartlett. In Bartlett, the Supreme Court explicitly denied discussion of coalition. No, no, no. I'm talking about, though, it's said that coalitions of white voters and minority voters can't constitute an actionable cause of action. If they rely on the majority voters. But if we look at injury based on race, it just seems to fly in the face of that. We don't, in class action, say we're going to divide up the class and say, for those people harmed by this unlawful drug or, you know, dangerous drug, the black citizens bring one claim, the white citizens bring another claim, the Hispanic . . . No, no, no. We're talking about voters, and we're talking about the race of voters. Right. And that's why the Supreme Court has considered in case after case in the last several decades claims brought on a coalition of plaintiffs. And it has said, I mean, I'll concede, it has said it has not decided the issue, but it has gone on to actually determine the claim. That was actually the case in Branovich, which is a vote denial case. It was brought by both Latino and black citizens. And so, the Supreme Court has consistently considered these cases. It may make sense that some members of this Court don't agree with this Court's precedent in Lulac v. Clements, but none of the factors to override stare decisis and overrule that decision have been met. For the reasons stated, the district court opinion should be affirmed. If not, if it's reversed, it should be remanded for constitutional claim consideration. At that time, I'm actually finished. I'm pleased to report, Judge Wilson, you're on target. Exactly. Immutable rights versus political coalitions. There are two causes of action on your sections. One is vote denial. And yes, Branovich talked about everyone who was subject to vote denial, but this is a vote delusion claim. And that's where the whole concept of adopting Rule 23 is completely misplaced. Here, classes are defined by the statute and they are called protected. And they are protected on the basis of race or color or language. In a vote delusion claim, you have the Supreme Court says, this is what you must show. Jingles, the first jingles precondition cannot be subsumed into the second one. It stands alone. Is there a majority of a protected class who has been, his vote has been deluded? It is not the issue of a political coalition. We are not protecting political coalitions. Political coalitions move and change with the sand in the tide. We protect immutable rights. And that's where Section of Rule 23 is completely inappropriate. The last portion of Section 2B states provided that nothing in this section establishes a right to have members of a protected class elected in numbers equal to their proportion in the population. Explain your position on whether that is in a sense saying you can't have coalitions. Well, it is in a sense. That's a friendly question. Coalitions, that is in a sense, because if you allow coalitions, you're going to allow what you just heard. We make up a certain percentage of the population, we're entitled to have a seat. Section 2 says, no, you're not entitled. You are, the only way you get there is meeting the first jingles precondition. Well, Mr. Nixon, you'll agree that there's, over here, there's nothing in the statute that expressly prohibits coalition claims. The jurisdiction wants to, on a political basis, create whatever kind of district they want. They may. It doesn't prohibit them from doing it. The difference is, it doesn't prohibit coalition claims. It doesn't prohibit it, but the question is, are they required? Remember, this is a cause of action. Well, your contention is they're not authorized by the statute. I'm sorry? You're saying they're not authorized by the statute. They're not. They are not. They are not. Coalition claims aren't authorized. They're not mandated. They're not mandated. Jurisdictions are not required to do it. And the Voting Rights Act has been amended several times since 1965. That's correct. Been reauthorized. You have to assume Congress was aware that coalition claims existed. Yes, probably. So Congress has had numerous opportunities to either expressly authorize or deny coalition claims. That's a political choice that Congress makes. Congress is the one that makes the choice. And it hasn't decided to say anything about that. It hasn't. Well, yes, it did. It did. It's the last sentence. It says, nothing in this section establishes a right to have members of a protected class elected in numbers equal to their proportion of population. And you just said earlier, in a sense, that means no coalition claims. Well, that's the only way you can get there. That's the only way you can get there. So Mr. Nixon, has Congress amended the Voting Rights Act since 1996? Since . . . 96. No. It hasn't amended anything? To my knowledge, no. No. Well, it was mentioned that there were . . . the Nixon case was decided, I guess, in 98. It's also easily been decades since Campos and Lulac and the rest. So there's lots of time that's gone over the dam. What Judge Higginbotham wrote, Judge Jones wrote, the ink hadn't changed on them since all that time. So where's this explosion, this avalanche of problematic areas that the Parade of Horribles is? Said differently, what's unique in this case, in this fact record, that just inescapably requires the result you seek? There . . . the black community does not create a majority in a district. I mean, is it the . . . It's the entire community . . . I guess what I'm asking, is it the concept itself, which I clearly know reasonable people can disagree about, but is there something in the fact record here that the district court had that just so pushes that issue? I mean, I know we have a question of law. We've got this huge deal about facts. I'm just trying to put my finger on, you know, what is it, the uniqueness here? Is it the partisanship? Is it something that just mushroomed to the top that this is the case, despite 30 years or whatever has passed since Kim Booth? My colleague who just spoke answered that question. I'm sorry? My colleague who just spoke answered that question. He said, give us a seat. We want a seat. They don't have a seat, and they want one. It's a political coalition. The United States wrote in their brief, it's a political coalition. The gentleman that spoke for the United States said the words, political coalition, at least half a dozen times. The difference . . . the fact in this case is that neither the black or the Hispanic community, innumerable rights were violated. Their political desire was thwarted, and that's what they're angry about, and they're trying to use this section to give them a remedy which doesn't exist. Okay. Therefore, I request that the court reverse the trial court, render judgment for the defendants. Thank you, counsel. The court will take a brief recess. Thank you.